**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

———————————————————

NATIONAL VETERANS LEGAL
SERVICES PROGRAM,

             Plaintiff,

           v.

UNITED STATES DEPARTMENT OF
DEFENSE, *et al.*,

             Defendants.

———————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:20-cv-00003

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR**
**PRELIMINARY INJUNCTION**

    Defendants United States Department of Defense, *et al.*, through counsel,

respectfully submit this memorandum in opposition to Plaintiff National Veterans Legal

Services Program's "Emergency Renewed Motion for Preliminary Injunction," *Dkt. No.* 21.

**INTRODUCTION**

    Plaintiff and Defendants want the same thing—full restoration of Defendants'

Electronic Reading Room website, which allows the public to review decisions made by

Defendants' Discharge Review Boards, Boards for Correction of Military Records, and

Physical Disability Board of Review.  Plaintiff is simply not satisfied with Defendants'

efforts to restore the website and invites this Court to hasten Defendants' performance

through the extraordinary step of a mandatory, preliminary injunction.  The Court should

deny Plaintiff's request for a preliminary injunction for numerous reasons.

    Defendants are following a statutory mandate to publish board decisions on their

website that do not contain personally identifiable information ("PII").  *See* 10 U.S.C. §

1552(a)(5).   Defendants have had setbacks in their effort to review and republish approximately 245,000 decisions, but have begun re-posting decisions and are diligently working to fully restore the website.   Ignoring Defendants' requirement to ensure that decisions do not contain PII before they are reposted, Plaintiff asks this Court to take over the restoration process by imposing artificial deadlines for decision publication.   Neither statute nor regulation, however, imposes any such deadlines, and Plaintiff's requested relief risks compromising veterans' and servicemembers' PII.

Plaintiff cannot meet the rigorous four-part standard for obtaining a preliminary injunction, much less the kind of *mandatory* injunction Plaintiff seeks, which would alter the status quo.   Plaintiff is unable to establish a likelihood of success on the merits for numerous reasons.   First, Plaintiff cannot demonstrate that this Court has jurisdiction over this action under the Administrative Procedure Act (APA), 5 U.S.C. § 706(1), because making decisions available to the public does not constitute "agency action" under the APA.   Doing so does not determine any rights or obligations from which legal obligations flow, and restoring the website is not a circumscribed and discrete act.   Nor is the relief Plaintiff seeks—immediate posting of decisions—"legally required," to the extent those decisions contain PII.

Even if Plaintiff's programmatic attack clears the jurisdictional hurdle, Plaintiff still cannot show that it is likely to succeed on the merits because, in the absence of any statutory timeline to publish decisions, Plaintiff's assertion that Defendants have "unlawfully withheld" final agency action fails as a matter of law.   5 U.S.C. § 706(1).   Plaintiff's assertion that final agency action is "unreasonably delayed" likewise fails under the

applicable standard.  *Id.; see Telecomms. Res. & Action Ctr. v. FCC,* 750 F.2d 70 (D.C. Cir. 1980) (*"TRAC"*).

Plaintiff is not suffering irreparable harm during the restoration process because, as stated on the website, it can contact specific boards at any time to obtain copies of relevant decisions.  The Services have responded to over 140 separate requests for decisions since April 2019, with an average response time of seven days.  Defendants are ready to assist Plaintiff with any request it makes.

The balance of equities also tips in favor of denying an injunction.  Defendants are statutorily prohibited from publishing decisions that contain PII.  If Defendants ignored the redaction requirement, veterans and service members would be vulnerable to suffering irreparable harm.  Plaintiff, on the other hand, still has access to relevant decisions as Defendants work to fully restore the website.

Finally, the public interest strongly disfavors a preliminary injunction.  As Defendants review and republish approximately 245,000 decisions to ensure that they do not contain PII, they may have to reallocate resources, develop new administrative systems, and explore technological solutions.  Asking the Court to supervise this process is the type of programmatic judicial review that the APA has foreclosed.

Accordingly, the Court should deny Plaintiff's extraordinary request for a mandatory, preliminary injunction that would require immediate restoration of access to pre-April 2019 decisions; publication of all post-April 2019 decisions within 60 days of issuance of the preliminary injunction or within 60 days of a board decision; and publication of all future decisions within 60 days of a board decision.

# BACKGROUND

## I. Statutory and Regulatory Background of Publication of Board Decisions

### A. Review Boards System

Congress has created a system through which members of the armed forces can request correction of their military records. 10 U.S.C. §§ 1551-1559. Under this system, the Secretary of each military department has the discretion to correct military records "when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Secretaries make corrections to military records by acting through boards of civilians that operate within the executive part of their military department—the Discharge Review Boards (DRBs), Boards for Corrections of Military Records (BCMRs), and DoD Physical Disability Board of Review ("PDBR"). *Id.* The Secretary of Homeland Security may also correct any military record of the Coast Guard in the same manner. *Id.*

### B. Non-Electronic Reading Room Library

Before board decisions were available to the public through the Internet, the Department of Defense ("DoD") ensured the public had access to DRB decisions by requiring such documents be made available for public inspection and copying in the Armed Forces Discharge Review/Correction Board Reading Room. DoDD 1332.28, DISCHARGE REVIEW BOARD PROCEDURES, para. L (August 11, 1982) (codified at 32 C.F.R. § 70.8(*l*)(4) (1982)). The documents in the Armed Forces Discharge Review/Correction Board Reading Room had to be indexed "in a usable and concise form so as to enable the public and those who represent applicants before the DRBs, to isolate from all decisions that are indexed, those cases that may be similar to an applicant's case and that indicate circumstances under or reasons for (or both) which the DRB to Secretary concerned

4

granted or denied relief." *Id*. The Department of the Army was responsible for maintaining the index at selected permanent locations throughout the United States and publishing a list of all locations in the Federal Register.[1] *Id*. at (*l*)(4)(iii).

### C. Creation of an Electronic Reading Room

In 2004, DoD Directive ("DoDD") 1332.41 was issued, which canceled DoDD 1332.28.[2] U.S. DEP'T OF DEF., DIR 1332.41, BOARDS FOR CORRECTION OF MILITARY RECORDS (BCMRS) AND DISCHARGE REVIEW BOARDS (DRBS), para. 4.3.5 (March 8, 2004) [hereinafter DoDD 1332.41]. Jettisoning the need to publish new decisions at a physical location with an accompanying index, DoDD 1332.41 created the DoD Electronic Reading Room. DoDD 1332.41, para 4.3.5. Specifically, it provides that the "The DoD Electronic Reading Room website is located at http://boards.af.mil and shall contain all the decisional documents since 1996 for each Department's boards and application forms for complaints to download electronically."[3] *Id.* DoDD 1332.41 says nothing about creating an index.

---

[1] On July 12, 1999, a notification in the Federal Register informed the public that it could contact Army Review Boards Agency for public inspection and copying of DRB documents located in the reading room. 64 Fed. Reg. 132, 37517 (July 12, 1999). It further provided notice that the Armed Forces Discharge Review/Correction Board Reading Room hours of operation were from 7:30 am through 4:00 pm, Monday through Friday, except for federal holidays. *Id*. Finally, it informed the public that DRB documents "are indexed in a usable and concise format so as to enable the public, the applicant and/or those who represent applicants, to locate a decision document that is similar in circumstances or reasons for which the DRB or the Secretary concerned granted or denied relief." *Id*.

[2] DoDD 1332.41, para. 1.1 says "This Directive cancels reference (a)…" Reference (a) is DoD Directive 1332.28, "Discharge Review Board (DRB) Procedures and Standards," August 11, 1982. Although DoDD 1332.41 is no longer operative, DoD appears to have overlooked rescinding the regulation that codified it, 32 C.F.R. § 70.8(*l*).

[3] Decisions pre-dating 1996 were maintained in microfiche form in the DoD Reading Room Library ("Library"). *Id*. The Library no longer exists because it was underutilized by the public. In approximately 2010, the Army returned all microfiche records to the respective Services. The regulation was never amended to reflect this reality.

On April 4, 2004, DoD Instruction ("DoDI") 1332.28 was issued.  Although DoDD 1332.41 addresses BCMRs and DRBs, DoDI 1332.28 deals solely with DRBs.  The DoD has not issued an Instruction specific to BCMRs, leaving DoDD 1332.41 as the sole DoD policy on them.[4]  The current version of DoDI 1332.28 requires DRB decisions be made available promptly for public access after a notice of final decision is sent to the applicant.  DoDI 1332.28, para. E3.12.1.  It further provides, "To prevent a clearly unwarranted invasion of personal privacy, identifying details of the applicant and other persons shall be deleted from documents made available to the public."  *Id*. at para. E3.12.2.  It requires making DRB decisions available in the DoD's Electronic Reading Room in a "usable and concise form so as to enable the public, and those representing applicants before the DRBs, to isolate from all decisions those cases that may be similar to an applicant's case and that indicate the circumstances under or reason for (or both) which the DRB or Secretary concerned granted or denied relief."  *Id.* at paras. E3.12.4. and E3.12.4.1.  DoDI 1332.28 says nothing about indexing documents that are in the Electronic Reading Room.

In 2016, Congress codified the Electronic Reading Room that DoD had created when it required that "each final decision of a board shall be made available to the public in electronic form on a centralized Internet website.  In any decisions so made available to the public, there shall be redacted personally identifiable information."  National Defense Authorization Act For Fiscal Year 2017, 114 P.L. 328, § 534 (Dec. 23, 2016) (codified as amended 10 U.S.C. § 1552(a)(5)).  The board decisions are made available to the public in the DoD Electronic Reading Room website located at http://boards.af.mil.  Congress did not mandate creating an index for the Electronic Reading Room.

---

[4] The DoD has issued a DoDI for PBDRs – DoDI 6040.44.

## II.  Factual Background

### A.  Discovery of Published PII

Although the Army Review Boards Agency ("ARBA") is the DoD Executive Agent of the Electronic Reading Room, the Air Force Legal Operations Agency ("AFLOA") hosts the actual reading room website on an Air Force server.  Petty Decl. ¶ 3.  In April 2019, AFLOA notified ARBA that a published decision on the Electronic Reading Room website contained personally identifiable information (PII).  Petty Decl. ¶ 4.  AFLOA next reviewed several random decisions in the Electronic Reading Room and discovered additional records containing PII.  Beacom Decl. ¶ 4.  On April 26, 2019, AFLOA removed public access to all decisions in the Electronic Reading Room.  Beacom Decl. ¶ 5.

During the entire time that decisions have been unavailable to the public on the Electronic Reading Room website, contact information for each board has been posted on the website so that the public could continue to obtain copies of decisions.  Petty Decl. ¶ 5. The Army, for example, has produced decisions for 93 separate requests from the public during the restoration process.  Petty Decl. ¶ 6.  The Army has averaged seven days to provide a response to requestors.  Petty Decl. ¶ 6.  The other Services have received a combined 55 requests, while also averaging seven days for a response.  Petty Decl.  ¶ 6.

### B.  Initial Plan to Republish Decisions

On July 19, 2019, the Air Force Research Laboratory ("AFRL") provided a report of electronic scans it conducted on the Electronic Reading Room's approximately 245,000 published decisions.  Petty Decl. ¶ 7.  The AFRL identified 2,364 documents that

potentially contained non-redacted PII.[5]  Petty Decl. ¶ 7.  Out of an abundance of caution, AFLOA decided to return all published decisions from the Electronic Reading Room website to the ARBA given its role as DoD Executive Agent for the Electronic Reading Room.  Petty Decl. ¶ 8; Beacom Decl. ¶ 7.  ARBA then sent its sister Services their respective portion of the decisions to review.  Petty Decl. ¶ 9.  The Services, in turn, were required to redact their portion of the 2,364 decisions containing suspected PII, certify that the remaining decisions did not contain any PII, resubmit the remaining decisions to AFLOA for publication, review the suspected decisions for PII, then resubmit the suspected decisions for republication.  Petty Decl. ¶ 10.

During the last week of January 2020, AFLOA received discs from the various Services.  Beacom Decl. ¶ 8.  AFLOA conducted a scan of the Navy's decisions, which revealed that some of the decisions contained unredacted social security numbers.  Beacom Decl. ¶ 8.  These decisions were not among the 2,364 decisions previously identified during the AFRL scan in April 2019 as possibly containing unredacted PII.  Beacom Decl. ¶ 8.  Because of this discovery, AFLOA decided that the Services would not be permitted to rely upon either the AFRL scan or the subsequent AFLOA scan to certify that decisions do not contain PII.  Beacom Decl. ¶ 8.  Thereafter, the DoD Executive Agent mandated that the services conduct a visual, line-by-line review of every decision before they would be forwarded to AFLOA for reposting to the Electronic Reading Room.  Petty Decl. ¶ 15; Beacom Decl. ¶ 8.

---

[5] Upon visual inspection, it was discovered that a few of 2,364 documents contained un-redacted PII, but the scan was also incorrectly identifying case numbers, document numbers, government telephone numbers, board member names, and dates as PII in the majority of the 2,364 documents.  Petty Decl. ¶ 8, footnote 1.

### C.  Current Efforts to Republish

The Services are now conducting a rolling republication of the approximately 245,000 decisions that were located in the Electronic Reading Room before April 2019. Petty Decl. ¶ 15.  Each service has been asked to visually review the most recent year of decisions and work backwards in time.  Petty Decl.  ¶ 15.  Every Thursday, the Services send AFLOA the decisions they have visually reviewed with a certification that they do not contain any PII.  Petty Decl.  ¶ 15.  AFLOA runs a scan for social security numbers as a final quality assurance check before publication of any decision.  Petty Decl.  ¶ 15.  The public, including Plaintiff, may continue to request copies of decisions as the Services work towards republishing all decisions on the Electronic Reading Room website.  Petty Decl. ¶¶ 5-6.  On January 31, 2020, the Services began posting decisions to the Electronic Reading Room.  Petty Decl. ¶ 16.  As of February 18, 2020, a total of 18,593 decision documents had been reposted on the website.  Beacom Decl. ¶ 9.

### STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Such a request "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances."  *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). To be eligible for a preliminary injunction, Plaintiff must demonstrate each of the following factors by a "clear showing:" (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest favors equitable relief.  *Id.; see also Int'l*

*Refugee Assistance Project v. Trump*, 883 F.3d 233, 256 (4th Cir. 2018); *see also Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013) (each element of the test must be satisfied). The requirement for showing a clear likelihood of success on the merits "is far stricter than a requirement that the plaintiff demonstrate only a grave or serious *question* for litigation." *Sarsour*, 245 F. Supp. 3d at 729 (alterations and quotation marks omitted; emphasis in original).

What Plaintiff seeks in this lawsuit is actually a mandatory preliminary injunction – a particularly disfavored form of relief.  "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *Vollette v. Watson*, 2012 WL 3026360, at *3 (E.D. Va. 2012) ("The [standard outlined in *Winter*] becomes even more exacting when a plaintiff seeks a preliminary injunction that mandates action, as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial.").  "Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) (internal quotation marks and citations omitted), *abrogation on other grounds by eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006).  "That is to say, a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind."  *Id.*

## ARGUMENT

Before turning to the four-factor test applicable to traditional preliminary injunctions, it is important to note that Plaintiff cannot meet the especially exacting standard of a *mandatory* preliminary injunction.  Granting the preliminary relief Plaintiff seeks would not "protect against irreparable harm in a deteriorating circumstance" or "preserve the court's ability to enter ultimate relief on the merits."  *Id.*  Here, the current circumstance is not deteriorating, but improving; decisions are being added to the website each week.  *See* Petty Decl. ¶¶ 15-16.  Moreover, the relief that Plaintiff seeks would not preserve the court's ability to enter ultimate relief, but rather would itself *constitute* the ultimate relief Plaintiff seeks to compel through the lawsuit: restoration of the website.  While Plaintiff seeks a particularly disfavored form of relief, even if the Court were considering a traditional preliminary injunction, Plaintiff could not meet any of the four factors.

### A.  Plaintiff cannot demonstrate a likelihood of success on the merits.

Preliminary relief is not available to Plaintiff because it cannot establish that it has a "clear and convincing probability of success" on the merits.  *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000).  As an initial matter, Plaintiff is unlikely to establish that the Court has jurisdiction to hear this case because making decisions available to the public is not "agency action" under the APA and the relief Plaintiff requests is not "legally required" under present circumstances.[6]  Moreover, even if the Court has jurisdiction,

---

[6] Defendants also question whether Plaintiff can establish organizational standing based on the Complaint's content, but reserves this issue for its forthcoming motion to dismiss.

Plaintiff cannot show that Defendants' efforts to restore the website constitute agency action that has been "unlawfully withheld" or "unreasonably delayed."

### 1. Plaintiff Fails to Challenge an "Agency Action."

Plaintiff invokes the APA, 5 U.S.C §§ 704, 706 as the basis of judicial review of Defendants' actions.  Compl. ¶ 7.  The APA waives the federal government's sovereign immunity for a limited set of suits, brought by a person suffering legal wrong because of agency action to obtain relief other than money damages.  5 U.S.C. § 702.  Judicial review under the APA is limited to final "agency action."  5 U.S.C. § 704.  Subject matter jurisdiction is lacking if the plaintiff fails to challenge a particular agency action that is fit for review.  *City of New York v. U.S. DoD*, 913 F.3d 423, 430 (4th Cir. 2019).

Like other parts of the APA, 5 U.S.C. § 706(1) requires the existence of "agency action."  *See* 5 U.S.C. § 706(1) ("The reviewing court shall—compel *agency action* unlawfully withheld or unreasonably delayed.") (emphasis added); *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 62 (2004).  The APA narrowly defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  As the Supreme Court explained in *SUWA,* the first five items in this list are discrete and circumscribed actions. 542 U.S. at 62.  The sixth item—failure to act—is properly understood as a failure to take one of the five enumerated agency actions or their equivalents.  *Id.*

Thus, "the term 'action' as used in the APA is a term of art that does not include all conduct" on the part of the government.  *City of New York,* 913 F.3d at 430 (quoting *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013)).  Rather, "agency action" is limited to those governmental acts such as rules and orders that

"determin[e] rights and obligations." *City of New York,* 913 F.3d at 430 (quoting *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 445 (4th Cir. 2014)); *see also Vill. of Bald Head Island,* 714 F.3d at 193 ("[T]he APA's definition of agency action focuses on an agency's determination of rights and obligations. . ., whether by rule, order, license, sanction, relief, or similar action.") (internal citation omitted).

Moreover, when challenging agency action, a plaintiff must identify discrete government conduct, rather than launch a broad programmatic attack on the government's operations. *City of New York,* 913 F.3d at 431. Courts are well suited to review specific agency actions, but "woefully ill-suited…to adjudicate generalized grievances asking…to improve an agency's performance." *Id.*

### a. Publicly posting decisions does not constitute an agency action as defined by the APA.

As discussed above, not all "action" taken by agencies constitutes "agency action" under the APA. *See Vill. of Bald Head Island*, 714 F.3d at 193. Instead, "the APA's definition of agency action focuses on an agency's determination of rights and obligations." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). At bottom, making decisions available to the public by posting them in the Electronic Reading Room does not constitute an action that "determines rights or obligations." This is because the rights or obligations flow from the original decisions themselves, not the act of making them available to the public. The Fourth Circuit addressed this issue in two cases where it determined that the original action taken determined the rights and obligations, whereas what followed did not.

In *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010), the plaintiff argued that publication of an ATF Reference Guide[7] constituted final agency action under the APA.  The Court looked at the definition of "agency action" under the APA, determining that the critical issue was whether the specific action was "designed to implement, interpret, or prescribe law."  *Id*. at 431.  There, the Court determined that the mere act of reprinting the relevant statutes, regulations, and rulings within the Reference Guide "undoubtedly did not 'implement, interpret, or prescribe law.'"  *Id*.  The publication itself only attempted to "report what already exists in the relevant body of … rulings."  *Id*.  Ultimately, the *Golden & Zimmerman* Court held that there was no decisionmaking process that culminated in the publication of the Reference Guide, and any such process that produced the ATF's interpretation contained in the Guide culminated with the 1969 Revenue Ruling.  *Id*. at 432.

This case is no different, as the decisionmaking process culminated with the issuance of the individual board decisions – not their subsequent publication.  Posting on a website does not represent final agency action because it is not an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Id*. (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  Like in *Golden & Zimmerman*, the publication of decisions to the Electronic Reading Room website is an action done simply

---

[7] The Reference Guide's origins date to Revenue Ruling 69-59 (1969), which was issued with the ATF was a division of the Internal Revenue Service.  *Id*. at 429.  The Guide had been published for approximately 40 years – covering 13 editions – and contained the text of the relevant federal firearms laws, implementing regulations, rulings, and general information.  *Id*.  It was "designed to assist firearm licensees comply with all laws and regulations governing the manufacture, importation, and distribution of firearms and ammunition."  *Id*.  The edition at issue in the case contained approximately 250 frequently asked questions ("FAQ") and answers.  The plaintiff asserted that a FAQ constituted final agency action.

to inform the public about previous legal decisions constituting final agency action, but does not itself alter the legal landscape. *Id*. at 433.

In *Village of Bald Head Island*, the plaintiff argued that the failure of the U.S. Army Corps of Engineers to implement a project in accordance with its commitments constituted final agency action. In 2000, the Corps issued a final agency action for a specific project. *Vill. of Bald Head Island*, 714 F.3d at 191. For years thereafter, the Corps continued to conduct maintenance related to this project. *Id*. However, in 2010 the Corps informed appellants that winter maintenance would be curtailed for budgetary reasons. *Id*. Emphasizing that "[t]he term 'action' as used in the APA is a term of art that does not include all conduct," *Id*. at 193, the Court determined that the 2000 approval of the project "was a 'determination' that surely amounted to agency action." *Id*. However, the plaintiffs only challenged the performance of that project in the years that followed the approval – not the determination.

Likewise, Plaintiff does not challenge the determination (*i.e.*, individual board decisions); it challenges Defendants' efforts to restore the website where the determinations are posted. Like in *Village of Bald Head*, the posting of decisions "is neither 'agency action' nor 'final' agency action subject to judicial review under the APA." *Id.*

### b. Plaintiff is raising a programmatic attack rather than challenging a discrete and specific agency action.

Plaintiff's challenge to Defendants' efforts to restore the website also does not qualify as "agency action" because Defendants' conduct is not sufficiently discrete or circumscribed. Plaintiff's first and third claims allege that Defendants' failure to publish BCMR and DRB decisions prior to and after April 2019 and index the Electronic Reading

Room website constitute separate final agency actions that are unlawfully withheld or unreasonably delayed.  Compl. ¶¶ 42-44, 51, 77, 79-80.  Plaintiff's second and fourth causes of action essentially makes the same claim, but are couched in terms of removing, instead of not publishing, the BCMR and DRB decisions.  Compl. ¶¶ 61, 67, 86, 90-91. No matter how many ways Plaintiff attempts to parse its claim, it is nothing more than an unreviewable programmatic attack asking this court to improve Defendants' operation of the Electronic Reading Room website.

The Defendants' process of restoring the website is not a circumscribed and discrete action under the APA.  *See NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) ("All five specific examples given in [the definition of agency action] are 'discrete' in character, and only actions that share this 'characteristic of discreteness' are reviewable under the APA.").  As the Fourth Circuit recently reiterated, "[w]hen challenging agency action—whether it be a particular action or a failure to act altogether—the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations."  *City of New York,* 913 F.3d at 431 (quoting *SUWA,* 542 U.S. at 64).  "General deficiencies in compliance . . . lack the specificity requisite for agency action."  *SUWA*, 545 U.S. at 66.

Far from reviewing circumscribed and discrete final agency actions, Plaintiff asks this Court to conduct a broad programmatic review of Defendants' restoration efforts. Defendant realized in April 2019 that it had not met § 1552's redaction requirement.  In an effort to meet both of § 1552's requirements, the agency removed access to the decisions, is reviewing the decisions for PII, and republishing the reviewed decisions on a rolling

basis.  During this restoration process, the public and Plaintiff may contact any board with specific requests for decisions.

Not satisfied with the restoration efforts, Plaintiff requests that this Court order Defendants to immediately restore access to pre-April 2019 decisions; publish all post-April 2019 decisions within 60 days of issuance of the preliminary injunction or within 60 days of a board decision; and publish all future decisions within 60 days of a board decision; and maintain an index that allows users to easily find relevant decisions.  Compl. Prayer for Relief.  Far exceeding any requirement imposed on Defendants by law or regulation, Plaintiff's requested relief underscores that their complaint is a programmatic attack that is not reviewable under the APA.  *City of New York*, 913 F.3d at 431 ("Courts are woefully ill-suited to adjudicate general grievances asking to improve an agency's performance.").  Here, Plaintiff is essentially demanding a general judicial review of Defendants' day-to-day operations in restoring and maintaining the DoD Electronic Reading Room website.  The Supreme Court has explicitly held the APA does not authorize this type of review.  *See SUWA*, 542 U.S. at 66-67.

> **2.      The relief Plaintiff seeks is not "legally required" given the dual mandate of 10 U.S.C. § 1552(a)(5).**

For the court to have jurisdiction to compel agency action under § 706(1), Plaintiff must also show that the agency action it seeks to compel is one that the agency is "legally required" to take.  *NAACP*, 945 F.3d at 189 (citing *SUWA,* 542 U.S. at 63).  Plaintiff requests that this Court order the immediate re-posting of decisions – which may contain PII – to the Electronic Reading Room website.  However, Plaintiff is not requesting action that is "legally required," because it ignores one of the two statutory mandates controlling this matter.

Plaintiff is correct to point this Court to 10 U.S.C. § 1552(a)(5).  Likewise, Plaintiff properly asserts the statue requires that "[e]ach final decision of a board shall be made available to the public in electronic form on a centralized Internet website."  10 U.S.C. § 1552(a)(5).  However, that is only one of two mandates contained within that section.  The second states, "[i]n any decision so made available to the public there shall be redacted all personally identifiable information."  *Id*.  Therefore, the two prongs of the statute must be read together.  When doing so, the result is that Defendants are not "legally required" to post decisions unless they are free of PII.

Plaintiff was made aware of the issue of identified PII in some of these decisions through both conversations with counsel and in court filings.  *Dkt. No.* 24, ¶ 3.  In spite of this, Plaintiff dismisses the notion that there are any PII issues by asserting that it "is not aware of any published Board decisions that contained PII."  *Dkt. No.* 25, 2.  Regardless of whether Plaintiff claims to have individually reviewed approximately 245,000 decisions previously posted on the Electronic Reading Room website, Defendants have established that PII was actually present in a small number of those decisions and that electronic scans were unreliable in detecting all of the PII at issue.  *See* Petty Decl. ¶ 13; Beacom Decl. ¶ 8. Here, Plaintiff seeks the immediate re-posting of decisions without a full review for PII. Because the Services are required to ensure that any posted decisions contain no PII, Plaintiff is not requesting action that is "legally required."

### 3.  Defendants have not "unlawfully withheld" any final agency action.

Plaintiff likewise cannot show that Defendants have "unlawfully withheld" a final agency action under 5 U.S.C. § 706(1) because nothing in § 1552, DoDD 1332.41, or 32 C.F.R. § 70.8 places any deadlines or time limits on when Defendants must publish

decisions.  *See South Carolina v. United States*, 907 F.3d 742, 759 (4th Cir. 2018) (when there is no statutory deadline, courts review agency inaction as being "unreasonably delayed" rather than "unlawfully withheld.").  In the absence of any statutory deadline, Plaintiff's assertions that Defendants' have "unlawfully withheld" final agency under 5 U.S.C. § 706(1) fail as a matter of law.

In addition to not being able to cite any temporal requirement in the governing statute, Plaintiff's assertion that not publishing DRB decisions is "unlawfully withheld" agency action in violation of 32 C.F.R. § 70.8 is also wrong because § 70.8 does not apply to the Electronic Reading Room website and, in any event, the DoDD that formed the basis for § 70.8 was cancelled by a later DoDD.  *Dkt. No.* 22, 8-9.  As explained *supra*, § 70.8(*l*)(1) only required making DRB decisions available to the public for physical inspection and copying and did not impose any requirement to publish board decisions in the Electronic Reading Room website, which did not even exist when § 70.8(*l*)(1) was adopted in 1982.

Plaintiff's demand that Defendants index records on the website also fails.  *See* Compl. ¶¶ 70-82.  Plaintiff conflates the requirements that 32 C.F.R. §70.8 imposed on the Armed Forces Review/Correction Board Reading Room with the requirements for the DoD Electronic Reading Room. They are two separate reading rooms with very different legal requirements.

Before board decisions were available to the public through the Internet, the DoD ensured the public had access to DRB documents by making them available for inspection in a physical Reading Room.  DoDD 1332.28, para. L; 32 C.F.R. §70.8(*l*)(4)(1982).  The documents contained the physical Reading Room had to be "indexed."  In 2004, the DoD

issued DoDD 1332.41, which created the Electronic Reading Room and noted the continued existence of the physical Reading Room for pre-1996 decisions. DoDD 1332.41 expressly canceled DoDD 1332.28, which had been published at 32 C.F.R. § 70.8. DoD never extended § 70.8(*l*)(4)'s indexing requirement for DRB decisions to the new Electronic Reading Room, nor did Congress do so when it enacted the National Defense Authorization Act For Fiscal Year 2017, 114 P.L. 328, § 534 (Dec. 23, 2016) (codified as amended 10 U.S.C. § 1552(a)(5)).

Plaintiff's claims that not publishing or indexing DRB decisions on the Electronic Reading Room website violates § 70.8 and that they are entitled to relief under 5 U.S.C. § 706(1) on this basis are thus meritless.

### 4. Defendants' restoration process is not an "unreasonable delay" of final agency action.

Plaintiff likewise cannot demonstrate that Defendant's restoration of the website constitutes "unreasonable delay" under § 706(1). In deciding whether an agency action is unreasonably delayed, courts consider:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable . . . [it] may supply content for the this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) . . . the effect of expediting delayed action on agency activities of a higher or competing priority; (5) . . . the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (citations omitted). *See South Carolina v. United States*, 907 F.3d 742, 759 (4th Cir. 2018) (adopting the *TRAC* factors); *see also Federal Energy Regulatory Commission v. Powhatan Energy Fund, LLC*, --- F.3d ----, 2020 WL 624190 at *10 (4th Cir. 2020).

Application of the *TRAC* factors to the facts in this case establishes that agency action was not unreasonably delayed. As to the first factor, Congress has not provided any timetable or any other indication of the speed at which Defendants must publish decisions on the website. *See* 10 U.S.C. § 1552. Despite a missing temporal requirement, Defendants have started republishing decisions on the website and continue to work diligently towards full restoration. *TRAC*, 750 F.2d at 72 ("…because agency has assured us that it is now moving expeditiously to resolve pending overcharge claims, we need not determine whether the cited delays are so egregious as to warrant mandamus."). The second factor is not applicable because of the aforementioned lack of timetable or other indication of speed. Likewise, the third factor is also not applicable because the challenged agency action does not imperil human health or similar considerations. As to the fourth factor, a court order compelling restoration may make the restoration process faster, but there is a tradeoff – namely, Defendants may have to stop processing current applications for board decisions in order to shift priority and resources to comply with any potential court order to restore the website. Petty Decl. ¶ 19. This could delay final board decisions for current applications from veterans and servicemembers. Petty Decl. ¶ 19. Unfortunately, the Defendants have finite resources in terms of personnel.[8] As to the fifth factor, Plaintiff's claimed prejudice that it cannot research board decisions is at least severely mitigated – if not wholly eliminated – by the fact that it can contact any board to receive copies of relevant decisions during the restoration process, as discussed *supra*. A process which has

---

[8] An agency's responsiveness, or lack thereof, "must be judged in [] light of the resources that Congress has supplied to the agency for the exercise of its function." *Wright v. Califano*, 587 F.2d 345, 353 (7th Cir. 1978) (holding that plaintiff's delayed decision was reasonable because the Social Security Administration's volume of applications increased and the agency had finite resources to address the increased volume).

taken, on average, seven days per request across the Services.  Finally, the sixth factor is not applicable because there is no evidence that Defendants are intentionally delaying re-posting all of the decisions to the Electronic Reading Room website.  Rather, they are performing their due diligence to ensure that no decisions containing PII are posted on the Electronic Reading Room in accordance with 10 U.S.C. § 1552(a)(5).

**B.  Plaintiff Will not Suffer Irreparable Harm.**

Plaintiff claims it and the veterans it represents will suffer irreparable harm.  *Dkt. No.* 22, 9.  As a preliminary matter, however, Plaintiff has not named a single member of its organization or veteran as a party to this lawsuit.  Plaintiff likewise has not identified any one specific veteran that it is hindered from assisting because board decisions are not available on the Electronic Reading Room website.  Finally, Plaintiff has not asserted representational standing in its complaint.  Thus, this court should ignore Plaintiff's arguments that some unnamed veterans it might represent will suffer irreparable harm.

Plaintiff claims that it is left fumbling in the dark unable to efficiently identify meritorious cases and properly advise veterans of their rights.  *Dkt. No.* 22, 9-10.  Plaintiff has not, however, indicated that it made any requests for decisions to a specific board during Defendants' restoration process.  The Electronic Reading Room website continues to have a message that the Services are conducting a quality assurance review and that decisional documents are available upon request.  Petty Decl. ¶ 5.  The contact information for all boards are provided so the public can request decisions.  Petty Decl. ¶ 5; s*ee* DoD Boards of Review Reading Rooms, available at https://boards.law.af.mil/index.htm (last accessed February 18, 2020).

Since April 2019, the Services have provided decision documents in response to over 140 requests from the public. Petty Decl. ¶ 6. The Services have responded in an average of seven days to these requests. Petty Decl. ¶ 6. If Plaintiff has specific requests for relevant documents, Defendants remain willing and ready to accommodate them. Until then, Plaintiff's claim of suffering irreparable harm, without requesting any decisions, remains remote and speculative. *Ried v. Johnson*, 333 F. Supp. 2d 543, 549 (4th Cir. 2004) ("Plaintiff must make a clear showing of irreparable harm that is 'neither remote nor speculative, but actual and imminent.'"); *Hodges v. Abraham*, 253 F. Supp. 2d 846, 864 (D.S.C. 2002) (irreparable harm must be actual and imminent rather than remote or speculative "to limit the deployment of the heavy artillery of a preliminary injunctive relief to situations in which it is readily apparent to the court that such relief is actually necessary to prevent harm from occurring."). As a result, Plaintiff cannot demonstrate that it will suffer irreparable harm by a "clear showing."

### C. The Balance of Equities Weighs in Favor of Denying an Injunction.

Defendants have a dual responsibility to redact and publish decisions. 10 U.S.C. §1552. In spite of Plaintiff's claims, restoring the website entails far more than just "switch[ing] the system that existed prior to April 2019 back on with little to no effort." *Dkt. No.* 22, 10. To the contrary, Defendants attempt at using computer scans to review the decisions for PII failed. Defendants must now review approximately 245,000 pre-April 2019 decisions for PII as it simultaneously redacts post-April 2019 decisions. As such, Defendants are working diligently to restore the Electronic Reading Room website without PII in compliance with the dual requirements of § 1552.

23

On the other hand, Plaintiff's chance for success on the merits is remote given its jurisdictional hurdles and inability to show Defendants are acting contrary to law or regulation. Plaintiff's alleged harm is likewise speculative and remote because it can make specific requests to the Boards for relevant decisions as Defendants republish decisions on the website. Defendants will accommodate any request by Plaintiff, or any other requestor. Put simply, equity does not support forcing Defendant to violate § 1552's redaction requirement and risk publishing PII to accommodate Plaintiff's immediate desire for access to decisions that are available to it through other means.

### D.  The public interest strongly disfavors an injunction.

The public interest further warrants denial of a preliminary injunction. Defendants are complying with 10 U.S.C. § 1552(a)(5) by redacting and republishing decisions on the Electronic Reading Room website. Redacting the decisions before republication also serves a compelling public interest of protecting the privacy rights of veterans and service members. *Cf.* 5 U.S.C. §552a(b)("no agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except with prior written consent of the individual to whom the record pertains…"). Public policy also disfavors APA review of Plaintiff's broad programmatic review of Defendants' restoration process. Disfavoring such attacks is grounded in separation of powers, which prevents courts from entering disfavored "obey the law" injunctions, or engaging in the day-to-day oversight of the executive's administrative practices. *City of New York,* 913 F.3d at 431.

Plaintiff asserts the public interest warrants an injunction because the Boards exist to correct errors that wrongfully preclude eligible veterans from receiving the benefits they

deserve.  *Dkt. No.* 22, 11.  Forcing Defendants to shift additional scarce resources to restoring the website, however, risks delaying or stopping the processing of current applications to comply with a court ordered restoration deadline.  In the absence of such order, veterans and service members will continue to receive consideration from the Boards, and Plaintiff is free to assist these applicants by requesting relevant decisions from the Boards until the website is fully restored.

***

Because Plaintiff cannot clearly show any of the four factors – let alone all four – much less meet the exacting standard required to obtain a mandatory preliminary injunction, the Court should deny Plaintiff's request for extraordinary relief.

**CONCLUSION**

For the aforementioned reasons, Plaintiff's motion for an emergency preliminary injunction should be denied.

Dated: February 18, 2020                    Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

LAUREN A. WETZLER
CHIEF, CIVIL DIVISION

_____/s/_____

JOHN E. SWORDS
Special Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3831
Fax:    (703) 299-3983
Email:  john.swords@usdoj.gov

*Counsel for Defendants*